IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

**BENJAMIN MURRELL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 09-06930        Chris Craft, Judge**

_____

**No. W2017-00581-CCA-R3-PC**

_____

The petitioner, Benjamin Murrell, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel regarding the jury instructions presented at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, Benjamin Murrell.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In 2009, the petitioner and his co-defendant engaged in a shooting that resulted in their victim being paralyzed. After a mistrial, a Shelby County jury ultimately convicted the petitioner of criminal attempt to commit voluntary manslaughter and employing a firearm during the commission of a dangerous felony for his participation in the shooting. The trial court imposed an effective eighteen-year sentence for the convictions, and the petitioner subsequently challenged the sufficiency of the evidence supporting his convictions on direct appeal. In denying his challenge, this Court summarized the underlying facts leading to the petitioner's convictions, as follows:

In September 2009, a Shelby County grand jury indicted [the petitioner] and the co[-]defendant, Melvin Jackson, for criminal attempt to commit first degree murder and employing a firearm during the commission of a dangerous felony. The trial court held a jury trial that resulted in [the petitioner's] acquittal for criminal attempt to commit first degree murder and a hung jury as to the lesser-included offense of criminal attempt to commit voluntary manslaughter. The trial court declared a mistrial and reset the case for trial.

The court held a retrial August 15-18, 2011, on the charges of criminal attempt to commit voluntary manslaughter and employing a firearm during the commission of a dangerous felony. The parties presented the following evidence at trial:

Officer Clarence Neal with the Memphis Police Department testified that on June 6, 2009, he responded to a "man down" call at 589 Mississippi Boulevard, in the area of the Foote Homes Housing Project ("Foote Homes"). When he arrived at the scene, he observed the victim, "a male black [who] was in front of a Lincoln Town Car." The victim was lying on the ground unconscious. Officer Neal said that the victim's mouth was open, that his eyes were closed, and that he appeared to be dead. He saw that the victim was bleeding and covered the victim's wounds with a towel "to keep [them] from bleeding out." He asked the victim who had injured him, but the victim was unresponsive. Officer Neal called paramedics to the scene, and the paramedics transported the victim to the hospital.

After the paramedics transported the victim to the hospital, Officer Neal searched for witnesses. After speaking with family members of the victim, he developed a suspect. He gave the information about the suspect to other officers, and they attempted to find the suspect.

Officer David Payment with the Memphis Police Department's Crime Scene Investigation Unit testified that when he arrived at the scene in this case, he observed "a vehicle parked on the street with spent casings and possible blood around it." He stated that officers had secured the scene with crime scene tape. Paramedics had already transported the victim to the hospital when Officer Payment arrived.

Officer Payment identified several photographs of the crime scene, including photographs of the spent casings. He also identified five spent .380 casings and a spent bullet fragment that he recovered from the scene.

- 2 -

Officer Payment testified that he did not find [the petitioner's] fingerprints or DNA at the scene. He further testified that he did not find a gun at the scene. He said that a camera outside the store where the shooting took place captured surveillance video; however, officers were unable to download the video.

Trena Jenkins testified that the victim, Marques Jenkins, was her son. On June 6, 2009, she went to the birthday party of her nephew, Damon Collier, inside an apartment in Foote Homes. Two of her other sons, Anthony and Tashun, were at the party as well. Ms. Jenkins said she knew [the petitioner] as "BAM." She further said that she knew [the petitioner] because [the petitioner's] sister and Mr. Collier had dated for seventeen years. Ms. Jenkins was friendly with [the petitioner] and did not have any problems with him before the day of this incident.

Ms. Jenkins stated that the party was going well when [the petitioner] arrived. However, at some point during the party, Ms. Jenkins' sister screamed, "Stop BAM!" According to Ms. Jenkins, her sister was "frantic" and "scared like something was fixing to happen." After speaking with her sister, Ms. Jenkins became concerned about what [the petitioner] was going to do and the safety of the victim. Ms. Jenkins asked [the petitioner] what happened, but he did not reply. Ms. Jenkins said [the petitioner] went to his uncle's apartment, and she went to find the victim. The victim arrived at Ms. Jenkins' location, and she asked him what was happening. She said there was "a lot of screaming going on." She further said the victim was trying to talk to her, but he was focused on [the petitioner], who was behind her. Ms. Jenkins stated that she was between the victim and [the petitioner], who were swinging at each other. She attempted to keep the men from fighting.

Ms. Jenkins testified that some teenagers came across the street as she was attempting to keep the victim and [the petitioner] from fighting. The teenagers were hollering and saying, "[Y]'all got BAM f[ ]ed up." The victim's cousins walked toward the teenagers, and a fight started in the street. Ms. Jenkins said that [the petitioner] disappeared when the fight started. The victim then went to help his cousins fight the teenagers who had come from across the street. Ms. Jenkins attempted to keep her sons, including the victim, from fighting. According to Ms. Jenkins, the fight lasted approximately forty-five seconds. It ended when [the petitioner] drove a vehicle into the crowd, striking three people. Ms. Jenkins asked

[the petitioner] what he was doing, and [the petitioner] said, "I'm sorry," put the vehicle in reverse, and left the scene.

After the fight, people began to leave the party. Ms. Jenkins began looking for her sons. She found her sons, Tashun and Anthony, and continued to look for the victim and another one of her sons, Sam. She sat in her car with Tashun and Anthony seated in the back and waited to see if the victim and Sam returned to the scene. She eventually saw the victim exiting a store with some food. She stated that she "thought everything was done" because the victim sat on the hood of a car that was in front of the store and began eating. The victim was accompanied by his cousin, Damon Collier, and his aunt, Sara Collier. Ms. Jenkins and the victim were "hollering" at each other about continuing the party on Beale Street. Ms. Jenkins continued to sit in her car, talking on her telephone and waiting for Sam to appear. Ms. Jenkins testified that she looked to her left and saw [the petitioner] and the co-defendant walking toward the victim. She said, "BAM, don't go down there with that sh[ ]." [The petitioner] looked at her but did not respond. Ms. Jenkins said [the petitioner] and the co-defendant walked in front of the victim. The co-defendant "pulled the gun up and had it directly in front of [the victim]." [The petitioner] grabbed the co-defendant's arm and said, "[M]an, shoot that mother f[ ]." The co-defendant shot the victim approximately four or five times. Ms. Jenkins stated that [the petitioner] and the co-defendant ran across the street toward her car. When they got to her car, she said, "I'm going to get you," to [the petitioner]. She said [the petitioner] smirked at her, but the co[-]defendant appeared afraid.

Ms. Jenkins testified that she got out of her car and ran toward the victim. She stopped approximately ten feet away from him because she did not want to see him in his condition. She called 9-1-1 and then "passed out." When Ms. Jenkins regained consciousness, she asked about the location of the victim. The ambulance was driving past her, and bystanders told her he was in the ambulance. Ms. Jenkins entered her vehicle and followed the ambulance to the Regional Medical Center. Initially, she was unsure whether the victim was alive but discovered he was alive approximately an hour later. Two days later, Ms. Jenkins learned that the victim was paralyzed because of the shooting.

Ms. Jenkins was able to identify [the petitioner] because she had known him for seventeen years. She had not previously known the co-defendant nor had she seen him before the party. The police showed her

photographs of suspects, and she identified [the petitioner] and the co[-]defendant.

Anthony Jenkins, the victim's brother, testified that he knew [the petitioner] because his father "used to be around [the petitioner]." Anthony knew the co-defendant because he went to school with the co-defendant's sister. He did not know whether [the petitioner] and the co[-]defendant were associated with the Crips gang. Anthony was at the birthday party on June 6, 2009, and said that the victim and [the petitioner], along with a crowd of people, were fighting in the middle of the street. Anthony heard [the petitioner] and the co-defendant tell the victim that they were going to come back "and get some more people." He said the fighting ended when [the petitioner] ran over two people with his vehicle. Anthony stated that the people who were fighting cleared the area and that an ambulance arrived at the scene. He left the scene with his friends.

Anthony further testified that he met with his mother, Ms. Jenkins, and his brother, Tashun, sometime later, and they sat in Ms. Jenkins' vehicle. Anthony stated that while he was in the vehicle, he saw [the petitioner] come from behind a house and give the co-defendant a gun. According to Anthony, [the petitioner] told the co-defendant to shoot the victim, but the co[-]defendant was shaking and did not want to shoot the victim. He stated that the co-defendant raised the gun toward the victim, that [the petitioner] shook the co-defendant's hand two or three times, and that the gun fired, shooting the victim. Anthony heard multiple shots fired. Anthony stated that [the petitioner] and the co-defendant ran past him as he exited the car and ran toward the victim.

On cross-examination, Anthony admitted that he did not testify at a prior hearing that [the petitioner] said he was returning with more people. He further admitted that at the prior hearing, he did not testify that [the petitioner] gave the co-defendant the gun.

Tashun Jenkins, another of the victim's brothers, testified that he attended the birthday party in Foote Homes on June 6, 2009. He stated that his family got into a physical altercation with some people who were across the street from the party. He said [the petitioner] got into a vehicle and ran over two or three people who were fighting. Tashun stated that [the petitioner] then exited the vehicle. Tashun's cousin attempted to stop the fight, but [the petitioner] pulled out a gun and told him that he was going to kill him. Tashun testified that [the petitioner] and the victim had argued

earlier in the day about a red shirt. He said the victim was wearing a red shirt, and [the petitioner] told the victim that he was going to "shoot or kill" him if he did not take off the red shirt.

Tashun stated that he was in his mother's vehicle when the co-defendant shot the victim. He saw [the petitioner] and the co-defendant "coming out the cut" between a house and an apartment complex. Tashun said appellant gave the co-defendant a gun and told him to shoot the victim. He stated that the co-defendant had the gun pointed at the victim, and [the petitioner] grabbed the co-defendant's hand. The gun fired four or five times when [the petitioner] grabbed the co-defendant's hand, and the bullets struck the victim. After the co-defendant shot [the victim], he and [the petitioner] ran into Foote Homes. Tashun exited the vehicle and ran toward the victim. He stated that the victim was in "critical condition" and was unable to talk.

On cross-examination, Tashun admitted that he did not testify at a prior hearing that he heard [the petitioner] say he was going to kill anyone. He only stated that [the petitioner] said he was going to shoot.

The victim, Marques Jenkins, identified [the petitioner] and stated that he had known him since he was five years old. He stated that his oldest cousin, Damon Collier, was in a relationship with [the petitioner's] sister. The victim stated that while growing up, he lived in Foote Homes for some time. He said the Crips gang was present in Foote Homes, and he became a member of the Crips when he was thirteen years old. He stated that [the petitioner] was also a Crip. [The petitioner] was "OG," which meant he was the head of the gang. The victim explained that although he and [the petitioner] were both members of the Crips gang, they belonged to different "sets." The victim was a member of the Raymond Crips, and [the petitioner] was a member of the Hoover Crips.

The victim recalled attending his cousin's birthday party in Foote Homes. He stated that he went to a house next door to talk to a friend, who was wearing a red shirt. The victim's friend told the victim that [the petitioner] had instructed him to take off the red shirt. The victim explained that the red shirt was disrespectful to the Crips because it was the color of the Bloods, a rival gang. The victim's friend removed the shirt. The victim said, "[H]e ain't your daddy, he don't [sic] buy your clothes or nothing [sic], why you [sic] take it off?" His friend shook his head, and the victim took the shirt from him and wore it.

The victim testified that it took some time for [the petitioner] to notice that he was wearing the red shirt. When [the petitioner] noticed that the victim was wearing the red shirt, "[h]e just came out [of] the blue and start[ed] pointing his finger in [the victim's] face." [The petitioner] told the victim that the victim thought he was "all that" and told the victim that he was going to get a "50 cal." The victim said "50 cal" meant a .50 caliber gun. The victim jumped up, ready to fight, but [the petitioner] ran away. Later, [the petitioner] reappeared and the victim and his family began arguing with [the petitioner's] "little Hoover Crips." The victim said [the petitioner] drove his car through the crowd of people who were arguing, attempting to hit the victim. However, the victim said his mother saw [the petitioner] coming and "snatched [him] out of the way." [The petitioner] struck the victim's uncle and two other people with his car. The victim said his mother drove him home. He was about to go inside but decided that he did not want to be at home by himself. His mother did not want to leave him there alone, so they returned to the party.

The victim testified that when he and his mother returned to the Foote Homes area, he was going to stay inside of his mother's vehicle, but he was hungry and decided to go into a nearby store to purchase something to eat. The victim recalled talking to his aunt and friend at the store, but he did not remember any events after that conversation. He stated that his next memory after speaking with people in the store was waking up in the hospital. The victim said he was shot four times, but he did not remember who shot him. He further said that he was hospitalized for three months and is paralyzed from the chest down because of the shooting.

The victim testified that his fight with [the petitioner] was about his friend's T-shirt. He denied having a "beef" with the co-defendant or [the petitioner] before the day of the shooting. He admitted that he had been drinking beer that day but said that he did not smoke anything. The victim did not have a gun or threaten anyone with a gun that day. He said that the only threats of gun use came from [the petitioner].

Melvin Jackson, [the petitioner's] co-defendant, testified that he shot the victim on June 6, 2009, during an altercation. According to the co-defendant, the victim and the victim's family "jump[ed] on him" as he was leaving a store on Mississippi Boulevard, and he shot the victim. He stated that he got the gun with which he shot the victim from a "junkie." The co-defendant further stated that he was alone when he shot the victim, and no

- 7 -

one told him to shoot the victim. After the co-defendant shot the victim, a couple of shots were fired at him. The co-defendant said he ran away and slept in an empty house until his father came to get him.

After his father retrieved him from the empty house, the co-defendant went to his father's house. He stated that he could not go back to his home because the victim "and them [sic] kin folks [or 'little Crip Homies'] was [sic] probably going to come through there." The co-defendant said he did not know to which Crips "set" the victim belonged. The co[-]defendant was a member of the Hoover Crips. The co-defendant stated that his father called the police, and the police arrested him at his father's house.

The co-defendant testified that he did not know [the petitioner] and was not afraid of him. He denied that [the petitioner] ordered him to shoot the victim and said, "If he ordered me, we would have been fighting when I stepped through the door. I just signed 15 years of my life away."

The State showed the co-defendant the "Advice of Rights" form that he signed; however, the co-defendant stated he did not remember signing the form because he was under the influence of cocaine and marijuana. The co-defendant reviewed his statement to police and testified that he did not remember making it. When asked about the portion of the statement where he said [the petitioner] gave him the gun to use, the co-defendant answered that he "probably" did not make the statement. He said that the only thing he remembered was "getting bound over to the juvenile [court]." The co-defendant did not know whether he wrote, "[T]his is BAM[,] and he told me to shoot the guy," beneath a photograph of [the petitioner]. The co-defendant stated that he only recalled telling the police "some story about how [the victim] and his boys jumped on [him] as [he] was leaving the store[.]" He further stated that he was the victim in this incident.

The co-defendant further testified that he did not recall a notarized letter he wrote, which stated that [the petitioner] did not have anything to do with the incident and was not around him at the time of the incident. The letter further stated that the co-defendant was not in a gang, that he was an honor student, and that the co-defendant's father made him "say that stuff so that they would blame it on [the petitioner]." The co-defendant admitted that the handwriting in the letter looked like his, but he was unsure whether he wrote the letter.

Sergeant Byron Braxton with the Memphis Police Department's Felony Response Unit testified that he investigated the incident in this case. He stated that a witness identified the co-defendant as the shooter. Sergeant Braxton contacted the co-defendant's mother and advised her that the police wanted to speak with the co-defendant because he was a suspect in a shooting.

The co-defendant, accompanied by his parents, went to the felony response unit six days after the shooting to speak with Sergeant Braxton. The co-defendant told Sergeant Braxton that he encountered [the petitioner] the day of the incident and that [the petitioner] told him that he wanted to shoot the victim. The co-defendant told [the petitioner] that he "didn't have any beef" with the victim and that [the petitioner] and the victim needed to "squash that." The co[-]defendant began to walk away when he felt something cold on the back of his neck. The co[-]defendant realized it was a gun. [The petitioner] told the co-defendant that he would "blow [the co[-]defendant's] mother-f[ ] brains out the back of [his] head" if he did not shoot the victim. [The petitioner] advised the co-defendant that he "better not try to run or move." The co-defendant stated that he cooperated with [the petitioner] because he was afraid. [The petitioner] put the gun in the co-defendant's hand and pushed him toward the victim. The co-defendant further told Sergeant Braxton that when he saw the victim, he closed his eyes and began shooting at the victim. The co-defendant stated to Sergeant Braxton that he attempted to aim low so the victim would fall. [The petitioner] took the gun away from the co-defendant, and the men ran in separate directions. Sergeant Braxton reduced the co-defendant's statement to writing. The State entered the statement as an exhibit at trial.

Sergeant Braxton further testified that in his statement, the co-defendant admitted he was a Hoover Crip. The co-defendant said that the victim was unarmed and that no one shot at the co-defendant during the incident. When Sergeant Braxton asked the co-defendant if he wanted to add anything to his statement, the co-defendant said, "I wish I could have taken the chance for [the petitioner] to kill me." Sergeant Braxton stated that he showed the co[-]defendant [the petitioner's] booking photograph, and the co-defendant identified [the petitioner] as "BAM," the person who instructed him to shoot the victim.

After hearing the evidence and deliberating, the jury found [the petitioner] guilty of criminal attempt to commit voluntary manslaughter and of employing a firearm during the commission of a dangerous felony. The

- 9 -

trial court sentenced [the petitioner] to eight years for criminal attempt to commit voluntary manslaughter and a consecutive ten-year sentence for employing a firearm during the commission of a dangerous felony, for a total effective sentence of eighteen years in the Tennessee Department of Correction.

*State v. Murrell*, No. W2011-02672-CCA-R3-CD, 2012 WL 6602908, at *1-6 (Tenn. Crim. App. Dec. 18, 2012), *perm. app. denied* (April 9, 2013) (internal footnotes omitted). Upon our review of the sufficiency of the evidence against the petitioner, we determined he was not entitled to relief and upheld his convictions. *Id.* at *8.

The petitioner then filed a *pro se* petition for post-conviction relief, wherein he "checked" every potential allegation provided in the standard form petition, including those that did not apply to his case. After appointment of counsel, the petitioner filed an amended petition for post-conviction relief, alleging he "received ineffective assistance by his counsel failing to request and to include a jury instruction on possession of a firearm during [the] commission of a dangerous felony" as a lesser-included offense of the charged offense of employing a firearm during the commission of a dangerous felony. The post-conviction court held an evidentiary hearing during which the petitioner and trial counsel both testified.

The petitioner testified he had an "off and on" relationship with trial counsel throughout both of his trials. According to the petitioner, trial counsel only met with him in jail "[p]robably maybe once," and otherwise, only talked to him briefly at court appearances. The petitioner stated while trial counsel provided him with the discovery file, he failed to fully investigate the case. In particular, the petitioner claimed trial counsel failed to obtain video footage of the shooting from a nearby store. The petitioner stated he never saw the alleged video footage of the incident but that it would have exonerated him. Further, the petitioner claimed trial counsel failed to "subpoena a few people that was (sic) out there that night like [his] fiancé[e], Ashley Upchurch[,]" and his cousin, Courtney Murrell. The petitioner explained Ms. Upchurch "could have been a good eyewitness to the situation where people were saying things happened and they didn't happen." Despite this testimony, the petitioner admitted he did not ask trial counsel to put Courtney Murrell on the stand and stated Ms. Upchurch did not attend the trial. Regarding other potential witnesses trial counsel failed to subpoena, the petitioner stated, "It was another one. It was a couple other people named but I don't know their names by heart. I've got it in my folder file but it was like two men and one woman. Three I wanted to witness for me." The petitioner stated he felt like trial counsel was "more in the favor of the court than he was in [his]."

- 10 -

Further, the petitioner claimed trial counsel failed to relay offers to him and as a result, he was forced into trial. The petitioner stated he "maybe was" threatening to trial counsel "[d]epending on what he did that day because he was really out of control how he was doing. He used to say things to me that were unprofessional." Additionally, the petitioner took issue with trial counsel's failure to request a jury instruction on the lesser-included offense of possession of a firearm during the commission of a dangerous felony, stating he "asked him for a motion for [a] lesser[-]included offense."

Trial counsel then testified. He stated he represented the petitioner for almost two years, and then detailed his investigation into the petitioner's case. In his efforts, trial counsel visited the scene of the crime, sent an investigator to the area of the crime to interview potential witnesses, and questioned the store owner and the State at length about the existence of a video of the shooting. According to trial counsel, no witnesses cooperated with the investigation and no video existed. Trial counsel stated the store manager provided video footage from the morning of the shooting to the victim's mother. The shooting, however, occurred around 11 p.m. and the evening footage, which might have captured the shooting, was deleted from the store's computer system before the parties realized the mistake. As a result, trial counsel ultimately determined video of the shooting did not exist. Regarding the alleged witnesses mentioned by the petitioner in his testimony, trial counsel stated he would have called the petitioner's fiancée and cousin to testify if they had been at trial.

Trial counsel stated the petitioner frightened him and "had taken a swing at [him] once." As such, trial counsel did not meet with him in "jail proper," but rather in an area where the head deputy "shackled" the petitioner. Trial counsel testified he relayed several offers to the petitioner prior to trial, which the petitioner rejected, and stated the trial court "voir dired [the petitioner] extensively" before setting the case for trial. According to trial counsel, the petitioner's co-defendant pled guilty to attempted murder between the first and second trial. As such, the co-defendant testified at the second trial, "and it was very obvious he was trying to tailor his testimony to [the petitioner's] benefit." Trial counsel explained the State "ended up introducing as an exhibit his -- [the co-defendant's] statement of admission as to what he did and to [the petitioner's] involvement." To that end, trial counsel stated, "[t]he testimony and *Jencks* material and all, everybody indicated that they did not think [the co-defendant] wanted to [shoot the victim] that he was very hesitant and that [the petitioner] kept ordering him to shoot [the victim] and [the petitioner] struck his arm a couple of times." Trial counsel stated he and the petitioner "discussed the facts inside and out," and the petitioner maintained "he did not order [the victim] to be shot by anybody."

As a result, trial counsel testified he had an "all or nothing" approach to the petitioner's case. Based upon this approach, trial counsel chose not to request a jury

instruction on the lesser-included offense of possession of a firearm during the commission of a dangerous felony. Trial counsel detailed his strategy, as follows:

> Now as far as the lesser[-]included offenses go, the possession of a firearm, I considered asking for that. However, I would implicitly be putting that gun in his hands, possession of that firearm. And so, strategically I chose not to put down, ask for that lesser[-]included, even though I didn't think it was a lesser[-]included. I didn't put it down for fear if the judge did grant it, I would be implying -- that I would be implying that he had possession of that gun. And I didn't want the jury to think he ever had that gun in his hand because his co-defendant in his statement to the police said that he felt something cold on his neck and that Mr. Murrell had put the gun on his neck. And strategically I didn't think that would be a good lesser[-]included offense to have before the jury. So strategically I thought the wisest thing to do was leave it alone.
>
> . . .
>
> That was strategy. I mean, I did not want him anywhere near that gun. I wanted that gun to be in [the co-defendant's] hands. Never [the petitioner's] hands. And strategically I thought if that -- one, I don't think the judge give (sic) that instruction, and two, if he does, I'm semi sort of admitting that he might have had that gun in his hand when I start arguing for lesser[-]included offenses. . . . If I'm asking for a lesser[-]included offense on count two, I would implicitly be putting that gun in his hand, at least that was my strategy so I chose not to ask for something that I didn't think was a lesser anyway. Now I've asked for things that I have been told are not lesser before such as aggravated assault on attempt murder one or attempt murder two. I have put that in motions before but I finally quit that because nobody's ever going to give it to me, and so wasting my time. And I thought of putting down a motion for lesser[-]included possession, one, would be denied. And two, I would again implicitly be putting the gun in his hand and I couldn't do it.

Trial counsel believed the possession instruction would have hurt the petitioner because "[n]obody ever said he was the shooter, ever."

After its review, the post-conviction court found the petitioner failed to meet his burden of proof as to any of his claims, and denied relief. This appeal followed.

## ANALYSIS

On appeal, the petitioner asserts he should be awarded a new trial because trial counsel failed to request a jury instruction for possession of a firearm during the commission of a dangerous felony. The petitioner claims he was "indicted and convicted for the offense of *employing* a firearm, but *possession* of a firearm during a dangerous felony is a lesser-included offense." The petitioner argues that had the possession instruction been provided to the jury, he "would be facing five years for possession rather than ten years for employment. This would reduce his sentence from 18 years to 13 years." The State asserts trial counsel's "decision not to request the [p]ossession [i]nstruction was a strategic choice based on adequate preparation" and, as such, the petitioner's claims are meritless. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction allegations of fact by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Here, trial counsel's alleged ineffectiveness stems from his decision not to request a jury instruction for possession of a firearm during the commission of a dangerous felony. In denying relief as to this issue, the post-conviction court cited three reasons. First, at the time of the petitioner's trial, possession of a firearm during the commission of a dangerous felony was not considered a lesser-included offense of employing a firearm during the commission of a dangerous felony. Rather, the "question of whether the possession offense was a lesser-included offense of the employment offense was unsettled." *See State v. Martin*, 505 S.W.3d 492, 503 (Tenn. 2016). In 2014, our Supreme Court settled the issue in *State v. Fayne*, concluding that "[p]ossession of a firearm during the commission of a dangerous felony qualifies as a lesser[-]included offense of employment of a firearm during the commission of a dangerous felony". 451 S.W.3d 362, 374 (Tenn. 2014). As such, the petitioner was not entitled, as a matter of law, to the instruction at trial in 2011. *See id.* at 372 (citing *State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003) (holding, in the context of plain error review, "[w]hile a defendant is entitled to a correct and complete charge of the law, this Court has previously held that the omission of an instruction on a lesser[-]included offense does not result in the breach of a clear and unequivocal rule of law when the status of the crime as a lesser[-]included

- 14 -

offense is not apparent based on prior law."")). Accordingly, the petitioner is not entitled to post-conviction relief as to this issue.

Secondly, the post-conviction court noted the evidence produced at trial warranted the employment of a firearm, rather than the possession of a firearm, instruction. The post-conviction court stated, "considering the facts of this case, it is obvious that the firearm was employed, as the victim was shot several times and paralyzed. If the petitioner possessed the firearm at all, it was clear that his intent was that it be employed, and the jury found that he was at a minimum criminally responsible for its employment during the attempted voluntary manslaughter." In denying relief, the post-conviction court noted, "even if [trial counsel] would have requested [the possession] instruction, this court would not have given it." For this reason, the petitioner cannot show how trial counsel's decision not to request the possession instruction prejudiced his case. *Strickland*, 466 U.S. at 687. The petitioner is not entitled to post-conviction relief.

Finally, the post-conviction court found trial counsel "didn't request the charge for strategic purposes," and we agree. At the evidentiary hearing, trial counsel provided a reasoned explanation of his trial strategy wherein he detailed why he chose not to request a jury instruction on the lesser-included offense of possession of a firearm during the commission of a dangerous felony. As outlined above, trial counsel "did not want [the petitioner] anywhere near that gun." Trial counsel's testimony makes clear that he weighed the evidence produced at trial against his "all or nothing" approach to the case and determined it best not to request the possession instruction so as to avoid "admitting that [the petitioner] might have had that gun in his hand." Our Supreme Court has stated, "[f]ailing to request lesser-included offense instructions will not constitute deficient performance, however, if the decision was a matter of strategy." *Moore v. State*, 485 S.W.3d 411, 419 (Tenn. 2016) (citing *Goad,* 938 S.W.2d at 369). The petitioner has failed to show how trial counsel's strategy of the "all or nothing" defense amounted to deficient performance or how it prejudiced the outcome of his case.

In denying post-conviction relief, the post-conviction court stated, "[f]rom the proof at the hearing on this petition and a careful reading of the trial record, this court can find no fault with [trial counsel's] performance." We agree with the post-conviction court's assessment of the petitioner's claims. No evidence exists in the record to support how trial counsel's performance was deficient or how the alleged deficient performance affected the outcome of his trial. *See Strickland*, 466 U.S. at 687. The petitioner is not entitled to post-conviction relief for his claim of ineffective assistance of counsel.

- 15 -

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____

J. ROSS DYER, JUDGE